**UNITED STATES of America, Plaintiff,**

v.

**Thomas BATES, Jerome Crowder, Bernard Green, Louis Hoover, Roland Lewis, and Edward Williams, Defendants.**

**No. 89–CR–908.**

United States District Court, N.D. Illinois, E.D.

Feb. 17, 1994.

■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

Barry Rand Elden and Scott C. Collins, Asst. U.S. Attys., Chicago, IL, for plaintiff.

Robert Clarke, Chicago, IL, for Thomas Bates.

Carl Clavelli, Chicago, IL, for Jerome Crowder.

Kent Carlson, Chicago, IL, for Bernard Green.

Donald Paull, Whitted and Kraning, Chicago, IL, for Louis Hoover.

Keith Spielfogel, Chicago, IL, for Roland Lewis.

Jerry B. Kurz, Chicago, IL, for Edward Williams.

## OPINION ORDER

RICHARD MILLS, District Judge:

"El Rukn III."

Motion for new trial grounded in prosecutorial misconduct.

The motion must be denied.

### I. *Background*

On December 10, 1991, the six defendants in this case—after 28 full trial days spanning four months—were found guilty by an *anonymous* jury of committing various drug offenses relative to their membership in the reputed "El Rukn" Chicago street gang. The charges included conspiracy to commit racketeering, conspiracy to possess narcotics with intent to distribute, and use of a communications facility to commit a narcotics offense.

Twelve former El Rukn witnesses testified for the United States concerning the Defendants' criminal activities. Two of those witnesses were Henry Harris and Harry Evans. The Defendants argue that they should receive a new trial because of the United States' failure to disclose certain benefits that were provided to six of the prosecution witnesses. The Defendants contend that the United States' failure to disclose such material was prejudicial to the Defendants, because had the information been submitted to the jury, the jury's verdict would have been different. The Defendants also contend that the cooperating prosecution witnesses were impermissibly allowed to be in contact with each other while in the Metropolitan Correctional Center (MCC), thus giving them the opportunity to collaborate on their testimony.

For an extensive chronicle of the government's appalling misconduct and the evidence the government failed to disclose, *see United States v. Burnside*, 824 F.Supp. 1215 (N.D.Ill.1993); *United States v. Andrews*, 824 F.Supp. 1273 (N.D.Ill.1993); and *United States v. Boyd*, 833 F.Supp. 1277 (N.D.Ill. 1993). This Court will accept the factual findings in those cases for the purpose of this motion for new trial.

To summarize: The alleged undisclosed benefits provided to the prosecution's cooperating witnesses included illegal drug use by

Harris and Evans, access to telephone calls, and contact visits with outsiders. This conduct occurred in the MCC, in the Alcohol, Tobacco and Firearms office (ATF), and in the United States Attorney's offices in Chicago. While the federal prosecutors did not provide drugs to Harris and Evans, they knew of the positive testings of Harris and Evans for drugs while in the MCC and failed to disclose those facts to defense counsel. Harris and Evans had been given liberal telephone and contact visit privileges, which probably enabled them to obtain the drugs used in the MCC. It has not been asserted, however, that Harris and Evans were under the influence of drugs when they testified in this case.

Four other prosecution witnesses—Ervin Lee, Jackie Clay, Derrick Kees, and Earl Hawkins—received undisclosed telephone privileges. The witnesses were also provided incidental undisclosed benefits, such as cigarettes, beer, clothing, and portable radios. The Defendants argue that if the jury had known of the benefits received by the cooperating witnesses, the information would have destroyed the witnesses' credibility, presumably because of bias, and hence, the jury would have acquitted the Defendants. The United States contends that the undisclosed evidence was immaterial in light of all of the other impeaching evidence which had been presented to the jury.

## II. *Legal Standard*

■ The U.S. Supreme Court has held that a prosecutor has a duty to disclose beneficial evidence to a defendant, if, without the evidence, the defendant would be deprived of his right to a fair trial. *United States v. Agurs,* 427 U.S. 97, 107–08, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976). The Supreme Court has applied the *Agurs* test to impeachment evidence and held that such evidence is material to the defendant and must be disclosed by the prosecution "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 669, 682, 105 S.Ct. 3375, 3376, 3383, 87 L.Ed.2d 481 (1985). Failure to disclose such

evidence requires that the defendant be given a new trial. *Id.* at 682, 105 S.Ct. at 3383.

■ Because of the trial court's firsthand observation of the evidence, the decision whether to allow a motion for a new trial "rests within the sound discretion of the trial court." *United States v. Reed,* 875 F.2d 107, 113 (7th Cir.1989). The U.S. Supreme Court has held that misconduct by government agents does not justify the reversal of a defendant's conviction where the misconduct did not impinge upon the defendant's right to a fair trial, i.e., prejudice the outcome of the defendant's trial. *United States v. Morrison,* 449 U.S. 361, 365–67, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981); *United States v. Payner,* 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980). The Seventh Circuit has recently extended these cases to cover the conduct of a prosecutor, holding that a district judge may not punish prosecutorial misconduct by setting aside a defendant's conviction where the misconduct was not prejudicial to the defendant. *United States v. Van Engel,* 15 F.3d 623 (7th Cir. 1993).

Consequently, this Court will examine the suppressed evidence held by the United States Attorney to determine whether, if such evidence had been presented at trial, it would have had a reasonable probability of changing the jury's verdict.

## III. *Analysis*

■ There were a total of 25 witnesses who testified for the United States in this case. Twelve of those witnesses were former El Rukn members (most being "ambassadors" and "generals") who were intimately familiar with the operations of the gang and the Defendants' participation in that gang over a period of more than a dozen years. These witnesses included Ervin Lee, Moses Steele, Jackie Clay, Theotis Clark, Derrick Kees, Earl Hawkins, Derrick Gardner, Herman Jackson, Maurice Greer, and Andrew Schaefer. No one witness' testimony was by itself determinative of the outcome of the case. Rather, each of the above named witnesses identified the Defendants and testified about various meetings and drug transactions in which they had participated with the Defendants. Even Defendant Crowder testi-

fied as to his drug transactions and his loyalty to Jeff Fort, the founder and unquestioned leader of the El Rukns.

Much of the testimony concerning the gang's activities was duplicative, and when considered together, tended to abundantly demonstrate the Defendants' participation in a far-reaching and violent racketeering enterprise for the distribution of drugs in Chicago. The witnesses testified concerning their travels with the Defendants in the Chicago and Milwaukee area to obtain or deliver drugs and/or money in exchange for the drugs. There was also vast testimony about the violent and heinous crimes engaged in by the witnesses and the Defendants to maintain the integrity of their El Rukn enterprise. These involved murders, robberies, destruction of property, the taking of hostages, etc. Based on the testimony of the twelve cooperating witnesses, there was ample evidence for a jury to have found the Defendants guilty of the racketeering crimes charged.

In addition to the former El Rukn witnesses, there were several Chicago police officers who testified concerning the materials discovered in the raids on the El Rukn premises. Those materials involved documents pertaining to the gang's operations, large amounts of drugs and associated paraphernalia, assault weapons, and money. Also, agents of ATF and DEA (Drug Enforcement Administration) testified as to searches for weapons and "wired buys" for drugs they conducted with the Defendants. It was on the basis of tips received from cooperating witnesses, the wired buys, and the searches of the gang's premises that the Defendants were all eventually apprehended. The documentary evidence and law enforcement testimony relating to the Defendants' association with the El Rukn gang merely served to reinforce the testimony of the cooperating witnesses as to the Defendants' participation in the operations of the El Rukn enterprise.

The Defendants argue that the suppressed impeachment evidence not revealed by the United States Attorney would have affected the outcome of the trial if it had been timely disclosed. However, there was already a tremendous amount of impeachment evidence that had been presented to the jury. The cooperating witnesses had testified to heavy use of drugs and the commission of scores of atrocities throughout their lifetimes. For instance, they had committed innumerable violent felonies, such as armed robbery, burglary, murder, and assaults with deadly weapons. Together, they had committed virtually every type of violent crime imaginable—in the extreme. The jury was presented with their history of drug dealing and violence. The witnesses also admitted to making numerous falsehoods to law enforcement officers in the past in order to conceal the truth about certain murders. The prosecution had disclosed that the cooperating witnesses and their families had received hundreds of dollars from the United States in exchange for the witnesses' cooperation. It was also revealed to the jury that the former El Rukn members were testifying in order to obtain significant reductions to their own sentences for the offenses to which they had pled guilty. The Court even admonished the jury in the instructions to consider the cooperating witnesses' testimony "with caution and great care."

## IV. Conclusion

In sum, then, the jury had been presented with so much damaging evidence concerning the credibility of the cooperating witnesses, that all of the undisclosed information as to telephone and visitation privileges for six of the witnesses, and drug use by Henry Harris and Harry Evans, would have merely added to the sum total—more of the same. While it is true that certain members of the U.S. Attorney's staff behaved in an outrageous and totally unprofessional manner in failing to properly supervise some of the cooperating witnesses and in failing to disclose the full extent of the cooperation benefits conferred, the Court is not convinced by a reasonable probability that had the additional evidence been disclosed, the jury's verdict would have been different. *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

The evidence in the record against the Defendants was simply overwhelming as to their association with the El Rukn criminal enterprise. Therefore, the disclosure of the drug use, contact visits, and telephone calls

by some of the witnesses would not have affected the general proof given the jury that the Defendants were engaged in a racketeering enterprise. The jury knew of the criminal history and drug usage of the cooperating witnesses. They also were aware of the fact that through cooperation with the United States Attorney, the witnesses would receive reductions in their sentences. And the jury was well aware of the witnesses' long association with the El Rukn gang and its activities.

The jury heard each of the twelve El Rukn witnesses provide testimony concerning the Defendants' role in that criminal enterprise. The jury was also presented with documentary evidence and testimony of law enforcement officers which corroborated the testimony of the various cooperating witnesses. Hence, had the jury also known that two of the witnesses may have used drugs while in the MCC, or that some of the witnesses were allowed to make telephone calls and receive contact visits with outsiders and receive other sundry benefits, the jury would still have found, based on all of the evidence presented, that the Defendants were part of a criminal enterprise engaged in the distribution of drugs in the Chicago area.

Finally, as to the claim that the cooperating witnesses were impermissibly allowed to associate with each other while in the MCC, there is no issue of any undisclosed evidence. The Defendants were aware of the fact that the witnesses were able to communicate in the MCC. The Defendants requested to introduce this "open unit" evidence into the record, but the Court denied the request, finding that the record already clearly reflected the fact that the witnesses had been allowed contact with each other while in the MCC.

*Ergo,* there being no reason for the Court to believe that the jury's verdict would have been different, the Defendants' motion for a new trial must be DENIED.